IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 19, 2016 Session

## STATE OF TENNESSEE v. WENDALL CURTIS DOREE

**Direct Appeal from the Circuit Court for Perry County
No. 2012-CR-81    James G. Martin, III, Judge**

_____

**No. M2015-00395-CCA-R3-CD – April 6, 2017**

_____

The Appellant, Wendall Curtis Doree, was convicted by a Perry County Circuit Court Jury of especially aggravated kidnapping, aggravated robbery, aggravated burglary, unlawful employment of a firearm during the commission of a dangerous offense, theft over $1,000, and facilitation of vandalism over $1,000. The trial court merged the theft conviction with the aggravated robbery conviction and imposed a total effective sentence of twenty-two years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his especially aggravated kidnapping conviction, contending that in light of State v. White, 362 S.W.3d 559 (Tenn. 2012), the State failed to adduce sufficient proof that the confinement of the victim was not incidental to the aggravated robbery and was sufficient, standing alone, to sustain his conviction of especially aggravated kidnapping. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Vanessa Pettigrew Bryan and J. Gregory Burlison, Franklin, Tennessee (on appeal and at trial), and Douglas Bates, Centerville, Tennessee (at trial), for the Appellant, Wendall Curtis Doree.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Jennifer Mason, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

# I.  Factual Background

The Appellant's convictions stemmed from a break-in that occurred at the home of the victim, Karen Langer, on October 14, 2012.  At trial, the victim testified that she lived at a "secluded" location on Carter Hollow Road in Linden.  Around 2:00 p.m. on October 14, she was upstairs and heard her dogs bark.  She looked outside, saw nothing, and went downstairs to prepare lunch.  While slicing tomatoes in the kitchen, she heard a noise from the front of the house.  She turned and saw two men, who were wearing masks and hoods and carrying black guns, walking toward her.  One man, who was later identified as Joshua Gregg, told her to put down the tomato knife, and she complied.  The other man, who was later identified as the Appellant, walked up to her.  She looked at him and said, "[Y]ou're Greg Doree's son."  The Appellant replied, "[N]o, I'm not."  The Appellant did not speak further but "indicated" that Mr. Gregg should "hold [her] there."  The Appellant searched through the cabinets and drawers and found an antique .410 rifle that the victim's father had given her.

While Mr. Gregg stayed with the victim, the Appellant went to the office at the front of the house and cut the telephone lines.  Mr. Gregg took the victim's cellular telephone, broke it in half, and put the pieces and the cordless house telephones into the toilet.

The Appellant "indicated" that Mr. Gregg should stay with the victim while the Appellant went upstairs.  Mr. Gregg told the victim that he was taking her laptop computer, which was on the kitchen table, to prevent her from contacting anyone.  He unplugged the computer and the computer mouse.  He told the Appellant that they needed to leave, then he instructed the victim to walk into the bathroom.  She complied, and he shut the bathroom door.  Shortly thereafter, Mr. Gregg told her to come out of the bathroom.  She saw the Appellant walk downstairs carrying a flat-screen television, which he then carried outside.

After the Appellant left the house, Mr. Gregg made the victim walk outside and told her that he was going to put her inside a shed.  She asked him not to, explaining that she could not get out of the shed.  He agreed not to put her inside the shed and asked for her car keys.  She gave him two sets of keys for her GMC Terrain and one set of keys for her Ford.  Afterward, Mr. Gregg instructed her to sit on her hands on the ground, and she complied.  The perpetrators put the television into the back of the Terrain.  The victim did not recall seeing them put the rifle into the car.  The Appellant got into the front passenger seat, and Mr. Gregg got into the driver's seat.  The victim told Mr. Gregg that the emergency brake was engaged.  He disengaged the emergency brake and told the victim that they would leave the vehicle at the end of the road.

"[A] while" after the perpetrators left, the victim walked to the kitchen. She remembered having an inexpensive telephone that the perpetrators did not find. She found the telephone and plugged it into a telephone jack. Before she made a call, however, she realized she did not want to stay at the house and began looking for a set of keys to the Ford that had been misplaced. She found the keys and drove to the house of her neighbor, Janet Jordan. After the victim told Ms. Jordan what had happened, Ms. Jordan called 911. An officer came to Ms. Jordan's residence and spoke with the victim. The officer and the victim went to the victim's residence.

The victim testified she was certain that she recognized the Appellant by his eyes, noting that he had done some yard work and picked blueberries for her that summer or the previous summer. She identified the Appellant in the courtroom. She said that the Appellant pointed his gun at her when he first entered the house.

The victim said the television was "a good size" Sanyo that she had bought for $500. She had bought the laptop computer for $500 a couple of years prior to the robbery. The rifle had sentimental value because it was a gift from her father, who had passed away. The victim said that she did not invite the men into her house and that she did not feel free to leave because Mr. Gregg kept a gun pointed at her. She acknowledged she had a computer in her office that the perpetrators did not take. She said that the computer was "closed," that she hardly ever used it, and that she never thought about using it to summon help.

The victim said that when she drove away from her house, she did not see the Terrain at the end of the driveway and that it was not returned to her until four or five months after the robbery. She paid $5,000 for replacement keys and repairs to the vehicle. The stolen television was returned to her house. An officer took it upstairs to determine if it fit inside the "dust ring" left on the table when the television was taken.

On cross-examination, the victim acknowledged she told Deputy Laura Leegan, the officer who responded to Ms. Jordan's house after the 911 call, that she was unsure of her identification of the Appellant. The victim explained that she was nervous when she spoke with Deputy Leegan but that she was certain of the identification by the time of trial.

The victim stated that she was with Mr. Gregg for five or ten minutes while the Appellant went through the house. She acknowledged that she was not locked inside the bathroom and estimated that she stayed inside the bathroom for thirty seconds to one minute.

Joshua Gregg testified that he pled guilty to facilitation of aggravated robbery, facilitation of aggravated burglary, and theft over $10,000, and received a sentence of

nine years for his role in the offenses. Mr. Gregg said that he and the Appellant spent the night of Saturday, October 13, at Mr. Gregg's house on Rockhouse Road. Mr. Gregg and the Appellant were "partying" and taking drugs, such as methamphetamine and opiates. The next morning, the Appellant persuaded Mr. Gregg to go target shooting in the woods. Mr. Gregg had a 9 millimeter semiautomatic rifle, and the Appellant had a Mossberg 500 "pump action" shotgun. Mr. Gregg said that the weather was cool and that he and the Appellant were wearing hoodies, bandannas, and gloves.

Mr. Gregg did not realize that the Appellant was walking toward the victim's property until they were close to the house. The Appellant said that the victim owed him money for work he had done. The Appellant went into the house first. Mr. Gregg said that he did not intend to enter the house, but when he heard the victim's voice, he "freaked out," put the bandanna around his face, and went into the house. The Appellant was pointing the shotgun at the victim, and she appeared frightened. She pointed at the Appellant and said, "I know you, you are Greg[ Doree's] son." The Appellant denied her claim. Mr. Gregg told the Appellant that they should leave, but the Appellant dropped his gun, began looking through the cabinets, and took a rifle from a cabinet. Mr. Gregg stayed with the victim while the Appellant searched the house. Mr. Gregg saw the Appellant take a television from the house. Mr. Gregg unplugged the victim's laptop computer, broke the victim's cellular telephone, removed the batteries from the house telephones, and put all of the telephones into the toilet to prevent her from contacting anyone before he and the Appellant could escape.

Mr. Gregg said that he put the victim inside the bathroom and went upstairs to speak with the Appellant. When he returned downstairs, he let the victim out of the bathroom. Mr. Gregg saw the Appellant go outside to load the television into the victim's vehicle. The victim's gun was already inside the vehicle. Mr. Gregg asked the victim for the keys to her vehicles, and after she relinquished the keys, he walked outside with her. Mr. Gregg and the Appellant discussed whether to put the victim inside the shed. The victim protested, saying that she would not be able to get out of the shed. Mr. Gregg relented and said that the victim could sit on her hands. He told the victim that he and the Appellant would leave her car "up the road." Mr. Gregg, who had the victim's laptop computer, got into the driver's seat of the victim's car, and the Appellant got into the passenger seat. The victim explained how to release the emergency brake, then Mr. Gregg drove up the driveway, around a bend, and through a small fence on a logging road. He stopped the vehicle, and they removed the stolen items from the vehicle and put them on the grass. They then walked through the woods back to Mr. Gregg's house, got into Mr. Gregg's vehicle, and returned to the logging road. They initially took the stolen items to Mr. Gregg's house but eventually took the television to the Appellant's house. Thereafter, Mr. Gregg wrapped the stolen rifle and buried it.

- 4 -

Mr. Gregg said that he had not intended to rob the victim but that he had participated in the robbery because he was on drugs and was frightened for the victim. He hid the guns used during the robbery in his basement then took them to Pennsylvania and sold them. He threw the laptop computer off of a bridge.

On cross-examination, Mr. Gregg denied pointing his gun at the victim during the robbery. He estimated that the victim was inside the bathroom for two minutes and asserted that the bathroom door was closed but not locked.

Mr. Gregg said that the victim had two vehicles. He did not intend to prevent her from using the vehicle they did not take. He disabled the telephones because he was concerned that she would call for help before he and the Appellant got away.

Janet Jordan testified that she and the victim were friends and that she lived approximately three miles from the victim. She explained that they lived in a rural area and that the houses were "spread out."

On October 14, the victim came to Ms. Jordan's house. She was nervous and shaking and told Ms. Jordan that she had been robbed. Ms. Jordan called 911. The victim told Ms. Jordan about the robbery. Ms. Jordan's testimony was consistent with the victim's trial testimony.

Perry County Deputy Laura Leegan testified that after the robbery, she went to Jordan's house and spoke with the victim, who was nervous. Deputy Leegan and the victim went to the victim's house, and the victim walked her through the house while describing the events. The events the victim described were consistent with her trial testimony. Deputy Leegan saw that several drawers were open and that a cellular telephone and a cordless house telephone were inside the toilet.

Chief Deputy Nick Weems testified that on October 15, he found the victim's stolen vehicle in a remote area on Rockhouse Road, which was a logging road approximately one and one-half to two miles from the victim's house. The front of the vehicle was damaged from being driven through a wire fence.

On October 17, Deputy Weems and Investigator Rod Spaid went to the Appellant's residence in Hohenwald. The Appellant refused to let the officers inside the house and spoke to them outside on the porch. The Appellant told the officers that he was at home on October 14 and that he had not been to Rockhouse Road for over one week. Deputy Weems noticed briar scratches on the Appellant's legs and "beggar's lice" on his jacket. Initially, the Appellant denied being in the woods, but when Detective Weems pointed out the scratches, the Appellant said that he had been cutting brush in a wooded area behind his house.

The Appellant eventually allowed the officers to go inside the house. Detective Weems saw a forty-two-inch flat-screen Sanyo television. The serial number plate had been removed from the back of the television. Detective Weems asked where the Appellant had gotten the television. The Appellant responded that he had bought it at "October Fest" for $100 but could not recall the name of the seller.

Afterwards, Detective Weems went to the victim's house and measured the dust ring left on the table from which the television was taken. He asked Hohenwald Police Officer Kevin Carroll to measure the base of the television in the Appellant's house. The measurements from the table and the television were "close, within an inch." Detective Weems explained that the dust ring could have been smeared when the television was taken, causing a slight difference in the measurements.

On October 18, Detective Weems and Investigator Spaid went to the Appellant's residence to collect the television. They spoke with the Appellant, and he said that after the police left his residence the first time, he went to Walmart with his brother, Joe Baxter. While at Walmart, they saw Lynn Pace, who had sold the television to the Appellant. The Appellant asked Mr. Pace to handwrite a bill of sale. The Appellant showed the bill of sale to the police. The Appellant acknowledged that he removed the serial number plate from the back of the television but maintained that he could find it.

Detective Weems and Investigator Spaid left the Appellant's house and went to Mr. Baxter's house. Eventually, Mr. Baxter agreed to help the police with the investigation. On October 30, Mr. Baxter went to the district attorney general's office and made a recorded telephone call to the Appellant. During the call, Mr. Baxter asked to purchase an antique gun. Afterward, the police equipped Mr. Baxter with an audio recording device and gave him $200 to pay for the rifle. Mr. Baxter then went to the Appellant's residence but was unable to complete the purchase. On November 2, Mr. Baxter made another unsuccessful attempt to buy the rifle.

Detective Weems said that he eventually returned the television to the victim. When he placed it on the table, he noticed that the base of the television fit inside the dust ring.

On March 31, 2014, Detective Weems went to Mr. Gregg's house to search for the victim's stolen rifle. Mr. Gregg assisted in the search. They found the rifle, which was wrapped in black, plastic garbage bags, at the rear of the property under a cedar tree log. Detective Weems estimated that the rifle was worth approximately $1,500 to $2,000. The Appellant and Mr. Gregg were charged for the crimes. Mr. Gregg left Tennessee and was eventually arrested in Pennsylvania.

Perry County Investigator Rod Spaid's testimony was consistent with Detective Weems's testimony. Investigator Spaid added that pieces of wheat and grass were sticking out of the television when they first saw it inside the Appellant's house. Investigator Spaid noted that the Appellant had described a location at October Fest where he allegedly had purchased the television, and Investigator Spaid knew the area was not grassy.

Joe Edward Baxter testified that on Monday, October 15, the Appellant called Mr. Baxter and said that he had "messed up." The Appellant told Mr. Baxter that he was wearing a mask when he went into the victim's house but that she recognized him. The Appellant said he had a firearm he wanted to sell and asked if Mr. Baxter wanted to buy it, but Mr. Baxter declined. Mr. Baxter said that the Appellant seemed "[s]paced out" during the conversation.

Later that evening, Mr. Baxter was at the Appellant's house. The Appellant told Mr. Baxter that the police had seen the television he took during the robbery. Mr. Baxter advised the Appellant that he needed a bill of sale. Mr. Baxter wrote a bill of sale for the Appellant and signed it with the name Lynn Pace.

Thereafter, Mr. Baxter, who was on parole, failed a drug test. A few days later, he decided to assist the police in the investigation. He agreed to wear a recording device on October 30 and November 2, 2012, while attempting to buy an antique .410 rifle from the Appellant.

Prior to the recorded conversations with the Appellant, the Appellant told Mr. Baxter that "he got a little too high and went in a house." The Appellant also said that he and Mr. Gregg had sat in the woods for three or four hours so Mr. Gregg "could get the courage up to go in." The Appellant told Mr. Baxter that he had an "antique .410" that he wanted to sell.

During the October 30 conversation with the Appellant, Mr. Baxter said that he wanted to buy the antique gun as a birthday present for his father. The Appellant said that he wanted $1,000 for the gun and that he would split the money evenly with Mr. Gregg. Mr. Baxter said that he did not have that much money. Nevertheless, the Appellant left the possibility of a sale "open." During the November 2 conversation with the Appellant, Mr. Baxter called Mr. Gregg, who was in Pennsylvania, to ask for the exact location of the gun. Mr. Gregg's response led Mr. Baxter to believe the gun was buried in the woods.

Based upon the foregoing, the jury found the Appellant guilty of especially aggravated kidnapping, aggravated robbery, aggravated burglary, unlawful employment of a firearm during the commission of a dangerous offense, theft over $1,000, and

facilitation of vandalism over $1,000.  The trial court merged the theft conviction with the aggravated robbery conviction.  The trial court sentenced the Appellant to twenty-two years for the especially aggravated kidnapping conviction, ten years for the aggravated robbery conviction, five years for the aggravated burglary conviction, six years for the unlawful employment of a firearm during the commission of a dangerous offense conviction, and twenty months for the facilitation of vandalism conviction.  The trial court ordered the Appellant, as a violent offender, to serve in confinement one hundred percent of his sentences for especially aggravated kidnapping and unlawful employment of a firearm during the commission of a dangerous offense.  The trial court ordered the Appellant to serve eighty-five percent of his aggravated robbery sentence in confinement. The trial court sentenced the Appellant as a standard, Range I offender to serve thirty percent of his sentences for aggravated burglary and facilitation of vandalism over $1,000 in confinement before becoming eligible for release.  The trial court ordered that the unlawful employment of a firearm during the commission of a dangerous offense sentence be served consecutively to the sentence for aggravated burglary.  The remaining counts were to be served concurrently for a total effective sentence of twenty-two years.

On appeal, the Appellant challenges only the sufficiency of the evidence sustaining his conviction of especially aggravated kidnapping.  Specifically, he argues that in light of State v. White, 362 S.W.3d 559 (Tenn. 2012), the State failed to adduce sufficient proof that the confinement of the victim was not incidental to the aggravated robbery and was sufficient, standing alone, to sustain his conviction of especially aggravated kidnapping.

## II.  Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct

and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 39-13-305(a)(1) defines especially aggravated kidnapping as "false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. § 39-13-302(a).

A review of our case law reveals a long-standing issue regarding the legitimacy of a kidnapping conviction when the act(s) establishing the offense occurred during an accompanying felony. In State v. White, 362 S.W.3d 559, 577 (Tenn. 2012), our supreme court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." The court concluded that a defendant's constitutional concerns were protected by appellate review of the sufficiency of the convicting evidence. Id. at 578. The court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." Id. To that end, the court devised the following instruction to be given by trial courts:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted).

In the instant case, the Appellant acknowledges that the trial court correctly instructed the jury pursuant to White. Nevertheless, he argues that the confinement of the victim was "trivial at best" and did not substantially interfere with her liberty and that, therefore, the proof did not support separate convictions of especially aggravated kidnapping and aggravated robbery. The Appellant contends that the confinement was brief and that the victim was not left in a potentially harmful situation. He notes that she was not tied up and that she could have contacted help by telephone or computer. Finally, he asserts that the aggravated robbery was not complete until the perpetrators left and that because the perpetrators took the guns with them, any further detention of the victim was not accomplished with a weapon. The State responds that the evidence was sufficient to sustain the Appellant's especially aggravated kidnapping conviction. We agree with the State.

In the light most favorable to the State, the proof adduced at trial reveals that the Appellant and Mr. Gregg, wearing hoodies and masks, went into the victim's house without her permission. Both men were armed: Mr. Gregg with a rifle and the Appellant with a shotgun. When the Appellant spoke to the victim, she said that she recognized him. The Appellant stopped speaking and had Mr. Gregg stay with the victim while he searched the house. Mr. Gregg kept his gun pointed at the victim. The Appellant cut the telephone lines, disabled the house telephones, and put the telephones in the toilet. Mr. Gregg took the victim's cellular telephone, broke it, and put it in the toilet. Mr. Gregg also took the victim's laptop computer. Mr. Gregg acknowledged that they disabled the telephones and took the computer to prevent the victim from contacting help. While the Appellant went upstairs, Mr. Gregg made the victim go into the bathroom, and he shut the bathroom door. The Appellant returned from upstairs, and Mr. Gregg released the victim. Mr. Gregg asked the victim for the keys to her vehicles, and she gave him all the keys she could find. Mr. Gregg led the victim outside and said he intended to put her

inside a shed. After the victim protested that she would not be able to get out of the shed, Mr. Gregg told her to sit on her hands. The perpetrators loaded the victim's antique rifle, flat-screen television, and laptop computer into one of her vehicles and drove away. We conclude that the perpetrators did not need to disable the victim's telephones, take her computer and her means of transportation, and confine her to the bathroom in order to effectuate the robbery. As Mr. Gregg acknowledged, the perpetrators' actions were designed to prevent the victim "from summoning assistance and reduce[] their risk of detection." State v. Romarcus Echols, No. W2013-01758-CCA-R3-CD, 2015 WL 151047, at *9 (Tenn. Crim. App. at Jackson, Jan. 12, 2015); see State v. Michael Frazier, No. W2015-01537-CCA-R3-CD, 2016 WL 4940209, at *5 (Tenn. Crim. App. at Jackson, Sept. 16, 2016), perm. to appeal denied, (Tenn., Dec. 15, 2016); State v. Cornelius Banks, No. W2014-02195-CCA-R3-CD, 2016 WL 369562, at *9 (Tenn. Crim. App. at Jackson, Jan. 29, 2016); State v. Roderick Dewayne Crosby, No. M2014-00914-CCA-R3-CD, 2015 WL 4197613, at *9 (Tenn. Crim. App. at Nashville, July 13, 2015), perm. to appeal denied, (Tenn., Oct. 15, 2015). Accordingly, we conclude that the evidence was sufficient to sustain the Appellant's conviction of especially aggravated kidnapping.

### III.  Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE